# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

LUIS SALAMAN,
*Defendant*.

No. 3:22-cr-76 (JAM)

### ORDER DENYING DEFENDANT SALAMAN'S MOTIONS TO SUPPRESS

The defendant Luis Salaman has filed two motions to suppress evidence arising from the investigation of his alleged narcotics trafficking activity. He seeks to suppress evidence of a pole camera's prolonged video surveillance of his home as well as a range of evidence that was found inside his home during the course of the execution of a search warrant. I will deny the motions to suppress.

## BACKGROUND

A federal grand jury has charged Salaman with engaging in a fentanyl trafficking conspiracy from November 2021 through April 5, 2022 and also with several counts of possession with intent to distribute fentanyl on various dates within the same time period.[1] The charges stem from a lengthy FBI investigation as detailed in two search warrant affidavits.[2]

### *The pole camera*

During the investigation, law enforcement installed a video camera on a telephone pole near where they believed Salaman was living in a second-floor apartment of a multi-family house at 34 Houston Street in New Haven, Connecticut.  As shown in the photograph below, 34

---

[1] Doc. #96 (superseding indictment).
[2] Doc. #78-2 (master affidavit dated April 1, 2022 for criminal complaints, arrest warrants, and search warrants for Facebook account, premises, and cellphones); Doc. #83-1 (affidavit dated April 18, 2022 for search of four cellphones seized during search of 34 Houston Street in New Haven, CT).

Houston Street is the second house from the left, and this is the general view from the pole camera:[3]



The pole camera maintained continuous surveillance of the outside of 34 Houston Street and surroundings for nearly three months from February 14 to May 6, 2022.[4] The camera made a continuous video recording of all activities outside the house, and law enforcement agents could use the camera to pan and zoom in on subjects of interest.[5] The camera did not allow agents to see inside the house but, as the government acknowledges, it made a continuous record of "Salaman's comings and goings," as well as "the identities of individuals visiting the premises, and the makes, models, and license plates of arriving and departing cars."[6]

---

[3] Doc. #83-2 at 2.
[4] Doc. #78-1 at 7; Doc. #83 at 13-14. Because Salaman was arrested and detained on April 5, 2022, the pole camera did not surveil his activities after that date.
[5] Doc. #83 at 14.
[6] *Ibid.*

### *The controlled buys and related communications*

As a further part of its investigation, the FBI engaged in a series of "controlled purchase transactions," more colloquially known as "controlled buys." This is a common law enforcement investigation technique in which an informant or undercover agent negotiates with a suspect to buy narcotics, and then law enforcement agents document the transaction by various means such as by covert audio, covert video, and/or physical surveillance of the actors by law enforcement officers.

The first of the controlled buys occurred on November 16, 2021. A confidential source for the FBI contacted Salaman at a telephone number associated with an Alcatel cellphone that was in service from March 2021 to March 9, 2022. This telephone contact eventually led to an in-person encounter with Salaman where Salaman told the confidential source to deal with Ismael Heredia, one of several co-defendants in this action. The confidential source gave Heredia $2,750 in return for 50 grams of a substance that tested positive for heroin and cocaine.[7]

The next controlled buy occurred on December 2, 2021. A confidential source contacted Heredia, then met with Heredia to pay him for more than 50 grams of a substance that tested positive for fentanyl. Following this transaction, Heredia was surveilled as he drove to 34 Houston Street.[8]

Ten days later, on December 12, 2021, Salaman contacted the confidential source by means of a Facebook communication, and then the confidential source called Salaman at the Alcatel phone number. Salaman told the confidential source that Heredia could sell more fentanyl if the source wanted it.[9]

---

[7] Doc. #78-2 at 9-10, 12-15 (¶¶ 12, 17-26).
[8] *Id.* at 15-17 (¶¶ 28-34).
[9] *Id.* at 17-18 (¶¶ 35-36).

On that same day, Heredia contacted the confidential source to ask if he wanted the same amount or double the amount. This led to a meeting the next day where Heredia sold the source approximately 100 grams of a substance containing fentanyl and cocaine.[10]

The next controlled buy occurred on December 17, 2021. The confidential source bought about 150 grams of a fentanyl substance from Heredia. During their meeting, Heredia told the confidential source that he was offering a lower price because Salaman had vouched for the source. Following the transaction, Heredia drove to 34 Houston Street and entered the house. GPS location data for Salaman's Alcatel phone placed it within two dozen meters of 34 Houston Street at the time that Heredia entered the house.[11]

On or about January 6, 2022, Salaman messaged the confidential source by means of Facebook, and then the source called Salaman using the mobile phone application Text Now. During this phone conversation, Salaman told the confidential source that Heredia had given Salaman a lot of "product" and that Salaman could sell it to the source.[12]

On January 11, 2022, there was yet another controlled buy from Heredia and another man for about 50 grams of a fentanyl substance. After the transaction, Heredia and the other man drove to 34 Houston Street and went inside.[13]

The last of the controlled buys took place with Heredia on March 16, 2022.[14] In the meantime, Salaman had contacted the confidential source on February 8, 2022, offering to sell at $47 per gram.[15]

---

[10] *Id.* at 18-19 (¶¶ 37-42).
[11] *Id.* at 20-22 (¶¶ 44-52).
[12] *Id.* at 24 (¶ 60).
[13] *Id.* at 24-25 (¶¶ 61-64).
[14] *Id.* at 26-27 (¶¶ 65-68).
[15] *Id.* at 27 (¶ 70).

About one month later, Salaman engaged in another Facebook contact with the confidential source on or around March 10, 2022. Salaman told the confidential source that Heredia had dropped off approximately two kilograms of "product" from which Salaman would be willing to sell a kilogram for $25,000.[16]

On March 21, 2022, Salaman contacted the confidential source through Facebook to inquire if he had received complaints about product from Heredia.[17] Then on March 27, 2022, Salaman sent the confidential source a Facebook message advising that he had had a falling out with Heredia and furnishing a new telephone number (the last four digits ending with "4311") for Salaman to be reached at for future drug transactions.[18] Cellphone records reflect that Salaman's Alcatel phone number was no longer used after March 9, 2022.[19]

### *The search warrant for Salaman's apartment*

On April 1, 2022, law enforcement agents applied to a federal magistrate judge and on the basis of a lengthy search warrant affidavit received multiple warrants including for a search of the second floor apartment at 34 Houston Street.[20] As relevant here, the warrant authorized them to seize among other things the Alcatel cellphone allegedly used by Salaman as well as any "other cell phones."[21]

Four days later, law enforcement agents searched the Houston Street apartment.[22] According to the government, they did not find Salaman's Alcatel phone, but they found and seized four other cellphones. These four cellphones were found in the same room that had a letter addressed to Salaman and some of Salaman's clothing. Also in that room were small plastic

---

[16] *Id.* at 27 (¶ 72).
[17] *Id.* at 27-28 (¶ 73).
[18] *Id.* at 28 (¶ 74).
[19] *Id.* at 10 (¶ 12).
[20] *See id.* at 51-52.
[21] *Id.* at 52.
[22] Doc. #83-1 at 22.

baggies and a container of wax folds commonly used for narcotics packaging, as well as a white powder-like substance of the kind that drug dealers commonly use to add weight to their narcotics.[23] All these items of narcotics paraphernalia were on a dresser in the room.[24]

Three of the phones were in a black bag, and the fourth was in a black box. When the agents placed a call to the -4311 number that Salaman had furnished to the confidential source on March 27, 2022, it rang one of the three phones that was in the black bag.[25]

### *The search warrant for the four cellphones*

After seizing the four cellphones, the FBI applied again to a magistrate judge for warrants to search the four phones, which it received on April 18, 2022.[26] The warrants were required to be executed on or before May 2, 2022.[27] The forensic examiner received the phones on either April 18 or April 29, 2022, and data extraction began on June 1, 2022, concluding on June 15, 2022.[28]

## DISCUSSION

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.

---

[23] *Id.* at 22-23 (¶¶ 71-74).

[24] The April 18 affidavit implies that all of the packaging materials were found with the cutting agent in a large black plastic bag. *Id.* at 22-23 (¶ 73). By contrast, the government's briefing and photographs suggest that the box of wax folds was on the dresser near a black bag that had the small plastic baggies and bag of cutting agent. Doc. #275 at 16-17. Salaman does not dispute the government's account, and this minor conflict is not material to the issue of probable cause. Also, according to the government, "[i]n a separate room apparently used for storage, in a storage bin, investigators found a plastic bag containing two more knotted plastic bags filled with white powdery substances." *Id.* at 3; *see also id.* at 16 (photographs).

[25] Doc. #83-1 at 23 (¶ 74). Salaman does not dispute the circumstances of the agents' seizure of the four cellphones as recounted in the April 18 search warrant affidavit.

[26] *Id.* at 32, 35, 38, 41.

[27] Doc. #270-2 at 1.

[28] Doc. #270-1 at 3-4; Doc. #275 at 3-4.

Const. amend. IV. To effectuate this right, a court may exclude evidence that has been searched

or seized in violation of the Fourth Amendment. *See Herring v. United States*, 555 U.S. 135, 139

(2009); *United States v. Jones*, 43 F.4th 94, 110-11 (2d Cir. 2022).[29]

### The pole camera evidence

Salaman moves to suppress video evidence obtained by the pole camera that was

installed without a search warrant and that monitored the outside of his home while he was living

there for nearly two months from February 14 to his arrest on April 5, 2022. According to

Salaman, the use of the pole camera intruded upon his reasonable expectation of privacy and thus

amounted to a warrantless search in violation of the Fourth Amendment.

By way of background, not all law enforcement investigative activity amounts to a

"search" within the meaning of the Fourth Amendment. Instead, "[t]he Supreme Court has

articulated two tests for determining whether a police officer's conduct constitutes a 'search' for

purposes of the Fourth Amendment: whether the police officer physically intrudes on a

constitutionally protected area and, if not, whether the officer violates a person's reasonable

expectation of privacy." *United States v. Weaver*, 9 F.4th 129, 141 (2d Cir. 2021) (*en banc*).

Here, Salaman makes no claim that the installation or use of the pole camera involved a

physical intrusion on his property. Instead, he claims that the police camera's constant and

prolonged surveillance of the outside of his home violated his reasonable expectation of privacy.

Neither the Second Circuit nor the Supreme Court has addressed this issue in a published

opinion.[30] Unfortunately for Salaman, however, multiple federal appeals courts outside the

---

[29] Unless otherwise noted and for ease of reading, this ruling omits all internal quotations, brackets, and derivative citations for all quotations from cases.

[30] The Second Circuit has issued an unpublished ruling that the installation on neighboring property and use of outdoor cameras for nearly three months to record a person's home property did not violate the Fourth Amendment and also that town officials would be entitled to qualified immunity. *See Borg v. Town of Westport*, 685 F. App'x 10, 11 (2d Cir. 2017).

Second Circuit have ruled that the prolonged use of a pole camera to surveil the outside of a

person's home does not amount to a "search" for purposes of the Fourth Amendment. *See, e.g.,*

*United States v. Hay*, 95 F.4th 1304, 1317-18 (10th Cir. 2024); *United States v. Dennis,* 41 F.4th

732, 740-41 (5th Cir. 2022); *United States v. Tuggle*, 4 F.4th 505, 511 (7th Cir. 2021); *United*

*States v. Houston*, 813 F.3d 282, 289 (6th Cir. 2016); *United States v. Bucci*, 582 F.3d 108, 116-

17 (1st Cir. 2009). On the other side of the ledger, a few cases from state supreme courts and

federal district courts hold to the contrary. *See, e.g., People v. Tafoya*, 494 P.3d 613, 622-23

(Colo. 2021); *State v. Jones*, 903 N.W.2d 101, 113 (S.D. 2017); *United States v. Vargas*, 2014

WL 12982411, at *1 (E.D. Wash. 2014); *United States v. Houston*, 965 F. Supp. 2d 855, 871-72

(E.D. Tenn. 2013); *cf. Commonwealth v. Mora*, 150 N.E.3d 297, 302-313 (Mass. 2020) (use of

pole camera was search under Massachusetts constitution).

      Although Salaman does not have the weight of precedent in his favor, I think his

arguments on their merits are compelling in light of the reasoning and rationale of the Supreme

Court's decision in *Carpenter v. United States*, 585 U.S. 296 (2018). In *Carpenter*, the Supreme

Court ruled that it intruded upon a reasonable expectation of privacy for the government to

subpoena a person's cellphone company for records showing the person's historical location

information over the course of seven or more days. The government "invaded Carpenter's

reasonable expectation of privacy in the whole of his physical movements." *Id.* at 313.

      Courts have distinguished *Carpenter* on the ground that a pole camera reveals

information about just one location rather than the whole of one's movements. Thus, for

example, the Seventh Circuit in *Tuggle* observed that "the stationary cameras placed around

Tuggle's house captured an important sliver of Tuggle's life, but they did not paint the type of

exhaustive picture of his every movement that the Supreme Court has frowned upon." 4 F.4th at 524.

Fair enough. But, in my view, these courts do not give enough weight to the ways that non-stop pole camera surveillance of someone's home is even more intrusive than tracking their various locations outside the home.

Start with the fact that the camera focuses on the home. As the Supreme Court has ruled, "when it comes to the Fourth Amendment, the home is first among equals," and "[a]t the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (Scalia, J.). True enough, the pole camera does not expose intimacies inside the home, but it burdens a person's right to retreat to their home if the government tracks their every entry and exit as well as all others whom they may invite to their home.

Moreover, the disclosure at issue in *Carpenter* allowed the government in essence to draw a map of a person's prior movements through the community. That is invasive enough. But paper mapping of one's prior locations is less revealing than real-time, pan-and-zoom video monitoring of every time a person enters or leaves their home. Consider, too, that the video record is subject to indefinite retention for the government's endless inspection and review.

To be sure, a suspect like Salaman surely knows that the outside of his home is visible at all hours to the public. So in that sense he can verily be said to "assume the risk" that someone or the government may be watching. But that same kind of argument was made in *Carpenter* (as well as in *Carpenter*'s predecessor—*United States v. Jones*, 565 U.S. 400 (2012) —in which five Justices ruled that prolonged GPS surveillance of the travels of one's car intruded upon a reasonable expectation of privacy). The argument was that the government learned no more than

it could have if zealous and determined police officers had engaged in 24/7 surveillance of a suspect over a prolonged time period. But the *Carpenter* decision declined to accept this reasoning as dispositive. *See Carpenter*, 585 U.S. at 307 (noting how prolonged GPS monitoring of a car as it drives around "'impinges on expectations of privacy'—regardless of whether those movements were disclosed to the public at large") (citing the concurring opinions of five justices in *Jones*).

More generally, the *Carpenter* decision set aside the notion that—standing alone—the fact that a person exposes information to a third party or to the public *necessarily* means that the person has no subjective or reasonable expectation of privacy against the government's use of relentless electronic surveillance that compiles a cumulative and vast trove of highly personal details about one's life activities. Instead, the *Carpenter* decision adopted a practical view of what any person should reasonably expect to be private against an onslaught of advancingly sophisticated means of automated and continuous electronic monitoring.[31]

In light of *Carpenter*, several judges of the First Circuit have well stated the arguments for why the prolonged use of a pole camera to surveil the outside of a person's home constitutes a "search" for purposes of the Fourth Amendment. *See United States v. Moore-Bush,* 36 F.4th 320, 327-359 (1st Cir. 2022) (Barron, Thompson, and Kayatta, JJ., concurring). They conclude that "[t]he advance of technology has made the surveillance at issue here—the creation of a

---

[31] *See generally* Orin S. Kerr, *An Equilibrium-Adjustment Theory of the Fourth Amendment*, 125 Harv. L. Rev. 476, 481 (2011) (demonstrating how the Supreme Court's Fourth Amendment precedents are best explained by a theory of "equilibrium adjustment" in which the Court makes "adjustments" to doctrine "intuitively in response to felt necessities, but in rare cases . . . out of a conscious recognition of the need for changes to keep the law in balance in the face of new practices and technological change"). Although the government argues that law enforcement has used pole cameras for decades, pole camera capabilities are subject to increasing technological improvement that render them more intrusive than ever before. *See* Brief of *Amici Curiae* Electronic Frontier Foundation *et al.* in support of petition for writ of certiorari in *Travis Tuggle v. United States of America*, No. 21-541 (filed Nov. 10, 2021) (describing at length how pole camera technology has advanced and at lesser and lesser cost to law enforcement).

searchable, digital videologue of all the activities in the front curtilage of a home for many months—possible to an extent that has been unimaginable for most of our history," and that "[t]he result is that the government is newly able to conduct aggregative surveillance that undermines long held expectations of privacy." *Id.* at 360.

I agree. Any reasonable person would feel it to be immensely invasive if they learned that the government had installed a camera to surveil their home 24/7 for weeks or months on end. If their neighbor did the same thing, they could probably sue the neighbor for money damages. *See* Danielle D'Onfro and Daniel Epps, *The Fourth Amendment and General Law*, 132 YALE L.J. 910, 980, 984 (2023) (criticizing the refusal of courts to find any expectation of privacy against the government's use of pole cameras in light of state common law decisions ruling that "systemically recording one's neighbors is an invasion of their privacy even if the neighbors' activities are viewable from beyond the property line"); *see also C. W. v. Warzecha*, 225 Conn. App. 137, 150-51 (2024) (holding federal law enforcement agent liable at common law for prolonged non-trespassory camera surveillance of the outside of his neighbor's home).

The average person would be surprised to learn that the government may target their home for weeks and months on end with pole cameras with no probable cause or the permission of a judge. For this reason, I am convinced that the government conducts a "search" when it uses a pole camera to conduct prolonged and targeted video surveillance of the outside of a person's home. The government did so here to Salaman and therefore the government violated the Fourth Amendment when it used the pole camera without first obtaining a search warrant.

Still, however, that conclusion does not help Salaman in this case. That is because "the exclusionary rule applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or

systemic negligence." *United States v. Smith*, 967 F.3d 198, 211 (2d Cir. 2020) (citing *Davis v. United States*, 564 U.S. 229, 236-40 (2011), and *Herring v. United States*, 555 U.S. 135, 144 (2009)). By contrast, if the police have otherwise acted mistakenly but in objective good faith that they have not violated the Fourth Amendment, then the remedy of suppression is not appropriate.

The objective good faith inquiry asks "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances," and it recognizes that "application of [the] exclusionary rule [is] not warranted when the police act with an objectively reasonable good-faith belief that their conduct is lawful." *Id.* at 212. Thus, in *Smith*, the Second Circuit declined to apply the exclusionary rule to conduct by the police that violated a defendant's rights under the Fourth Amendment but where the record showed the violation to be an isolated act of negligence and where "precedent ran both ways" concerning the legality of the officer's conduct at the time of the conduct at issue. *Ibid.*

From more than ten years as a federal judge, I know that law enforcement very frequently installs pole cameras outside the homes of suspects who are under investigation and that they do so without first applying for a search warrant. Although there is no published decision of the Second Circuit or the Supreme Court that explicitly addresses and authorizes the warrantless installation and use of pole cameras, most cases (as discussed above) hold that a warrant is not required. While I think the core reasoning and rationale of the *Carpenter* decision strongly supports a conclusion that prolonged pole camera monitoring of a home constitutes a search for which a warrant should be obtained, the *Carpenter* decision itself professes to be "a narrow one" and disclaims without elaboration its application to the use of "conventional surveillance techniques and tools, such as security cameras." 585 U.S. at 316.

So at least as the legal landscape lies now, an objectively reasonable law enforcement officer within the Second Circuit would believe that they need not apply for a search warrant before installing and using a pole camera to engage in prolonged surveillance of the outside of a person's home. Under these circumstances, I agree with the conclusions of multiple other courts who have declined to apply the exclusionary rule in a similar context. *See United States v. Mayo*, 615 F. Supp. 3d 914, 923 (S.D. Iowa 2022), *aff'd on other grounds*, 97 F.4th 552 (8th Cir. 2024); *Jones*, 903 N.W.2d at 114-15; *United States v. Mazzara*, 2017 WL 4862793, at *12-13 (S.D.N.Y. 2017); *cf. Moore-Bush*, 36 F.4th at 359 (Barron, Thompson, and Kayatta, JJ., concurring). Accordingly, I will deny Salaman's motion to suppress the pole camera evidence.

### *Particularity requirement*

Salaman argues that the warrant for 34 Houston Street and the follow-up warrant to search four cellphones found there did not comply with the particularity requirement of the Fourth Amendment. The particularity requirement flows from the text of the Fourth Amendment itself, which states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, *and particularly describing the place to be searched, and the persons or things to be seized*." U.S. Const. amend. IV (emphasis added).

According to the Second Circuit, "[t]he particularity requirement has three components." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013). These three components are: (1) that "a warrant must identify the specific offense for which police have established probable cause," (2) that "a warrant must describe the place to be searched," and (3) that "the warrant must specify the items to be seized by their relation to designated crimes." *Id.* at 445-46.

For searches of electronic storage devices, the Second Circuit has cautioned that "the particularity requirement assumes even greater importance." *Id.* at 446. That is because "[t]he

potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is

enormous." *Id.* at 447. Indeed, modern cell phones are mobile hard drives, and "[m]odern cell

phones, as a category, implicate privacy concerns far beyond those implicated by the search of a

cigarette pack, a wallet, or a purse." *Riley v. California*, 573 U.S. 373, 393 (2014). Cell phones

often contain "vast trove[s]" of personal information such as diary entries, personal photographs,

medical data, and banking information. *See United States v. Ganias*, 824 F. 3d 199, 218 (2d Cir.

2016).

Here, it is readily apparent that the cellphone search warrants meet all three components

of the Fourth Amendment's particularity requirement. First, the affidavit in support of the search

warrants not only establishes probable cause to believe that Salaman was using cellphones to

commit federal drug crimes but also establishes probable cause to believe that there would be

information on the cellphones that constituted evidence of those crimes.[32] Second, the warrant

identifies with great detail the specific phones to be searched.[33]

Third, the warrant specifies the scope of the search of these phones by relation to the

designated crimes. Under the heading "Particular Things to be Seized," each warrant allows the

seizure only of "records and information evidencing drug trafficking offenses in violation of

Title 21, United States Code, Sections 841(a)(1), 846 (Conspiracy to Possess with Intent to

Distribute Controlled Substances), and 843(b) (Use of a Communications Facility to Further

Drug Trafficking)" that "relate to the above-listed offenses."[34] Each warrant then specifies

categories of information to be seized in connection with the specified offenses, such as "events

showing or tending to show the commission of, or connecting or tending to connect a person to,

---

[32] Doc. #78-2 at 4-46; Doc. #83-1 at 4-30.

[33] Doc. #78-2 at 52, 55, 56; Doc. #83-1 at 32, 35, 38, 41.

[34] Doc. #78-2 at 57; Doc. #83-1 at 48, 54, 59, 66.

violations of 21 U.S.C. §§ 841(a)(1) and 846 and 843"; "GPS coordinates, waypoints, destinations, addresses, and location search parameters"; "internet browsing history"; "images and videos in the memory of the telephone"; and "records, however created or stored, which tend to demonstrate ownership and use of the device/s."[35]

The Second Circuit has long held that "broadly worded categories of items available for seizure" may satisfy the particularity requirement, and courts must construe such categories and terms "in light of an illustrative list of seizable items." *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990). Even use of the catchall terms "any and all" do not necessarily invalidate a cellphone warrant. *United States v. Romain*, 678 F. App'x 23, 26 (2d Cir. 2017) (rejecting particularity challenge to cellphone warrant that specified "the 'kinds of files,' . . . to be seized from the cellphone [which] were enumerated and included: (1) telephone numbers; (2) caller identification information; (3) call log information; (4) recently called numbers; (5) address information; (6) voicemails, text messages, emails, and photographs; and (7) the content of 'apps.'").

Salaman makes no real effort to show that the three particularity components set forth by the Second Circuit are not satisfied here. Instead, he faults the warrants for not being more particular in additional ways beyond what the Second Circuit has explicitly required.

So, for example, he objects that the warrants permitted law enforcement to search the "contents of the entire cellphones," with no limitations as to which internal applications (or "apps") on the cellphones could be opened by law enforcement officers.[36] He cites two cases for the proposition that app-specific limitations are constitutionally required, but these are not consistent with Second Circuit law. *See Burns v. United States*, 235 A.3d 758, 775 (D.C. 2020);

---

[35] *Ibid.*
[36] Doc. #78-1 at 4-5.

*In re Nextel Cellular Telephone*, 2014 WL 2898262, at *13 (D. Kan. 2014). The Second Circuit has generally cautioned in the electronic search context, "because there is currently no way to ascertain the content of a file without opening it and because files containing evidence of a crime may be intermingled with millions of innocuous files, by necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there." *Galpin*, 720 F.3d at 447. Thus, "[t]he Fourth Amendment does not require a perfect description of the data to be searched and seized" because law enforcement officers "cannot readily anticipate how a suspect will store information related to the charged crimes." *United States v. Ulbricht*, 858 F.3d 71, 100, 102 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018).

For this reason, multiple courts have declined to rule that the particularity requirement bars a search warrant from allowing access by law enforcement to the entire contents of a cellphone. *See Romain*, 678 F. App'x at 26; *United States v. Dawkins*, 2019 WL 2464924, at *7 (S.D.N.Y. 2019); *United States v. Gatto*, 313 F. Supp. 3d 551, 559-61 (S.D.N.Y. 2018). Instead, where a search warrant includes "an illustrative list" of items to be seized, "coupled with a reference to the crimes for which evidence is sought," then it "supplies sufficiently limiting guidance." *United States v. Mendlowitz*, 2019 WL 1017533, at *10 (S.D.N.Y. 2019); *see also United States v. Elkorany*, 2021 WL 3668086, at *3 (S.D.N.Y. 2021) (warrant which "list[ed] specific categories of items relating to the subject offenses to be seized" was sufficiently particularized).

Salaman next objects that the warrants lacked reasonable temporal limitations.[37] He complains that while the indictment alleged criminal activity from November 2021 through April

---

[37] *Id.* at 6.

5, 2022, the warrants did not limit the officers' search of the cellphones to data from that time period.[38]

Some courts have suggested that a lack of temporal limitations in a search warrant may reinforce a conclusion that it is insufficiently particular. *See United States v. Zemlyansky*, 945 F. Supp. 2d 438, 460 (S.D.N.Y. 2013). But temporal limitations are just one factor a court may consider and are not the "sole factor." *United States v. Harry*, 2022 WL 343963, at *4 (D. Conn. 2022).

None of the cases cited by Salaman stand for the proposition that a lack of temporal limitations *alone* renders a warrant insufficiently particular where the warrant contains other limiting language to guide law enforcement review. *See, e.g.*, *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 163 (2d Cir. 2019) (warrant was facially deficient where it did not include a reference *to the alleged crimes* or a temporal scope for the items to be seized); *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) (Facebook warrants that "required disclosure . . . of virtually every kind of data that could be found in a social media account" should have been limited to data related to the charged crimes and within the relevant timeframe); *United States v. Lazar*, 604 F.3d 230, 238 (6th Cir. 2010) (warrant that referenced "no specific patients, no specific transactions, and most importantly, no time frame" was overbroad).

Yet a more basic problem with Salaman's objection to the absence of time limitations is that it rests on a false premise that the only relevant evidence to be found on a suspect's cellphone is of communications or events that occurred during the time period when the suspect was engaged in criminal wrongdoing. It is often the case, however, that communications or

---

[38] *Ibid.* Similarly, he complains that while the investigation indicated that Salaman had stopped using the Alcatel cellphone on or around March 9, the warrant did not limit the search of that phone to before that date. But this objection appears to be mooted out by the fact that the government did not find the Alcatel cellphone when it searched 34 Houston Street.

events occurring both *before* and *after* a crime shed light on the commission of the crime. For example, evidence of communications prior to a crime may reflect planning and preparation for the crime. Similarly, evidence of communications after a crime may reflect a suspect's acknowledgement of his involvement in the crime or even reflect a suspect's efforts to conceal involvement in the crime.

Moreover, when incriminating evidence of any kind is found on a cellphone, the government has a strong interest in establishing who owned or controlled the cellphone. The warrants here specifically authorized the seizure of information from the telephones that showed the identity of the cellphones' users.[39] This separate interest of the government in establishing the identity of the cellphone user often requires an examination of data that pre-dates or post-dates the time period when a suspect was actively engaged in criminal activity.

In any event, even if Salaman were right that the cellphone warrants were not particularized, the remedy of suppression would not be justified absent a showing that law enforcement did not rely in good faith on the magistrate judge's issuance of the warrants. *See United States v. Leon*, 468 U.S. 897, 920-21 (1984); *United States v. Boles*, 914 F.3d 95, 104 (2d Cir. 2019). In light of the fact that the warrant applications met all three particularity components set forth by the Second Circuit, and in light of the reasons outlined above that cast doubt on Salaman's arguments for additional particularity limitations, there are no grounds to conclude that law enforcement did not rely in good faith on the magistrate judge's determination that the particularity requirement was satisfied. Accordingly, I will deny Salaman's motion to suppress evidence from the search of the cellphones insofar as the motion is based on the objection that the warrants failed to comply with the Fourth Amendment's particularity requirement.

---

[39] Doc. #78-2 at 57; Doc. #83-1 at 33, 36, 39, 42.

*Probable cause to seize and search the four cellphones*

Salaman next argues that law enforcement lacked probable cause to seize or search the four cellphones from 34 Houston Street. Probable cause exists "where a totality of the circumstances indicates a 'fair probability that contraband or evidence of a crime will be found.'" *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[P]robable cause must be grounded in sufficient facts to establish the sort of 'fair probability' on which 'reasonable and prudent [individuals], not legal technicians, act.'" *Ibid.* (quoting *Gates*, 462 U.S. at 238).

As to the initial seizure of the four cellphones, the April 1 affidavit in support of the search warrant for 34 Houston Street set forth enough facts to establish probable cause to seize not just the Alcatel cellphone but any other cellphones on the premises connected to drug trafficking. The affidavit made clear that Salaman was using at least two cellphones to conduct illegal drug activity: the Alcatel phone that he used until early March 2022 and whatever cellphone was associated with the -4311 number that he gave to the confidential source on March 27, 2022.

Salaman complains that he merely furnished the -4311 number to the confidential source (whom he thought was a drug purchaser) and that there was no evidence that he actually used the -4311 number for drug dealing. But this argument overlooks the Supreme Court's admonition that the probable cause standard is not a "high bar" and "requires only a probability or substantial chance of criminal activity, *not an actual showing of such activity*." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (emphasis added). The fact that Salaman gave this telephone number to a known drug customer supplied ample reason to believe that Salaman was using this telephone for drug trafficking.

When deciding to allow the seizure of additional cellphones other than the Alcatel cellphone that the agents might find at 34 Houston Street, the magistrate judge could have relied on the facts involving Salaman's use of multiple cellphones, as well as the opinion of the highly experienced FBI agent affiant that drug dealers often use multiple cellphones in order to thwart detection and to compartmentalize their contacts and operations.[40] "[T]he experience and opinion of the requesting agent is 'an important factor to be considered by the judge reviewing a warrant application.'" *United States v. King*, 2018 WL 4005734, at \*5 (D. Conn. 2018) (quoting *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (relying in part on a DEA agent's affidavit explaining that, in his experience, "major drug traffickers frequently maintain at their homes large amounts of cash, drugs, books, ledgers and other documents evidencing their criminal activities")); *see also United States v. Young*, 745 F.2d 733, 758 (2d Cir. 1984) ("[T]he magistrate was entitled to credit agent Garrett's specialized knowledge about the practices of narcotics dealers."). In short, there was probable cause to support the seizure of the four cellphones from 34 Houston Street as the April 1 search warrant allowed.

Similarly, the April 18 affidavit also established probable cause to search the four cellphones that had been seized at 34 Houston Street. Indeed, probable cause was even stronger in light of the circumstances surrounding the agents' discovery of the cellphones. The four cellphones were all found in a room that was used by Salaman and that also contained narcotics paraphernalia. Three of the cellphones were in one bag, and a call to the -4311 number revealed that one of those three cellphones was the -4311 cellphone. There was obvious probable cause to search the -4311 cellphone, and the fact that Salaman stashed two more cellphones in the very

---

[40] Doc. #78-2 at 39 (¶ 106); *see also* Doc. #83-1 at 23 (¶ 75) (additionally noting that "drug traffickers who discontinue use of a particular phone will often keep that phone in a secure location in order to maintain records of customer phone numbers and historical communications (for example, preserved text messages)").

same bag with the -4311 phone made it reasonably probable that they were also for drug dealing and would contain incriminating data.

Although the inference is not quite as strong for the fourth cellphone that was found in a separate box, it was still in the same room that Salaman used and that also contained narcotics paraphernalia. There was a fair probability that the fourth cellphone would contain incriminating information as well. In short, there was probable cause to support the search of all four cellphones that were seized from 34 Houston Street and as the April 18 search warrants allowed.

To the extent that Salaman complains that the warrant allowed for the seizure or search of other people's cellphones, he has no standing to assert the Fourth Amendment rights of third parties. As the Supreme Court has explained, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted," and "it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the [exclusionary] rule's protections." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Therefore, "[i]t has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993) (*per curiam*) (emphasis in original).

Salaman misplaces his reliance on *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017). In that case, the police executed a search warrant for cellphones in a residence despite the absence of any particularized evidence that the suspect (who had recently been released from prison) even had a cellphone, much less that any cellphone he had would shed light on a crime that had taken place more than a year before. The facts here involving the recent incriminating use of multiple cellphones are very different.

21

In any event, even if probable cause were lacking for the agents to seize or search the four cellphones, this is a textbook case for application of the good faith exception to the exclusionary rule. That exception allows for law enforcement agents to rely in objective good faith on a magistrate judge's determination that a given set of facts gives rise to probable cause. *See Leon*, 468 U.S. at 920-21; *Boles*, 914 F.3d at 103-05. Because it was at least reasonably debatable that probable cause existed to support the seizure and search warrants for the four cellphones, there is no reason why the agents could not rely on the magistrate judges' determinations. Therefore, the exclusionary rule should not apply.

### *Timeliness of execution of search warrants for the cellphones*

Salaman argues that the search warrants for the four cellphones were not executed in compliance with Rule 41 of the Federal Rules of Criminal Procedure, which requires that a search or seizure warrant must "command the officer to: (i) execute the warrant within a specified time no longer than 14 days." Fed. R. Crim. P. 41(e)(2)(A)(i). He complains that the FBI waited a few weeks past the 14-day mark before extracting data from the cellphones.

The problem for Salaman is that he does not show that the rule imposes a 14-day deadline on the extraction of data from a cellphone. Indeed, a separate provision of the rule that deals specifically with warrants for electronically stored information states that "[t]he time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, *and not to any later off-site copying or review*." Fed. R. Crim. P. 41(e)(2)(B) (emphasis added).

The commentary to this rule goes on to explain how "[c]omputers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search

22

location," and how "[t]his rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." Fed. R. Crim. P. 41(e)(2) advisory committee's note to 2009 amendments.

The commentary further clarifies that the "execution period" referred to in the rule is intended to refer to "the actual execution of the warrant and the on-site activity" rather than off-site review. It then explains how it would be impracticable for the rule to purport to regulate the time when law enforcement officers must conduct their extraction or review of data from electronic storage devices that have been validly seized:

> While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs.

*Ibid.*

Salaman's argument altogether fails to reckon with any of these provisions or commentary. He just cites the 14-day time limit as if that were the end of the matter. Nor does he grapple with substantial case authority discussing these provisions and persuasively concluding that, for purposes of Rule 41(e)(2)(A), a search warrant for electronic media is deemed executed upon seizure of the media rather than upon its later review. *See United States v. Estime,* 2020 WL 6075554, at *13-14 (S.D.N.Y. 2020) (collecting cases); *United States v. Sosa*, 379 F. Supp. 3d 217, 222 (S.D.N.Y. 2019) (same).

Moreover, even if Salaman were right that the warrant was not timely executed as required under Rule 41, he does not show that suppression would be an appropriate remedy.

"[V]iolations of Rule 41 alone should not lead to exclusion unless (1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the rule." *United States v. Carpenter*, 2018 WL 6933160, at *5-6 (E.D.N.Y. 2018) (quoting *United States v. Burke*, 517 F.2d 377, 386-87 (2d Cir. 1975)).

Salaman makes no claim at all of prejudice from the alleged delay. Nor does he show intentional and deliberate disregard of Rule 41's time limits. To the contrary, any violation of Rule 41 was at worst a mistake of law—an objectively reasonable one in light of the substantial case authority concluding that the seizure of an electronic device is itself enough to satisfy the Rule's 14-day execution requirement. Accordingly, I will deny Salaman's motion to suppress evidence from the search of the four cellphones insofar as it is based on his argument that the warrant was not timely executed as required under Rule 41.

### *Seizure of narcotics paraphernalia*

Lastly, Salaman moves to suppress the narcotics paraphernalia evidence that law enforcement agents seized from 34 Houston Street. As noted above, law enforcement agents found numerous small baggies, a box of wax folds, and plastic bags containing non-narcotic cutting agent powders. Salaman complains that the search warrant by its terms did not authorize the seizure of narcotics paraphernalia and that such evidence falls outside the scope of evidence subject to seizure under the "plain view" exception to the Fourth Amendment.

"Under the plain view exception, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

So long as the police have at least probable cause to believe that the object is incriminating and so long as they are in a position where they have a lawful right of access to the object, then the plain view exception allows the police to seize the object without a warrant. *See Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987).

Salaman argues that the plain view exception cannot be established absent a showing that law enforcement's discovery of the evidence was inadvertent. But the Supreme Court explicitly rejected this argument more than 30 years ago. *See Horton v. California*, 496 U.S. 128, 130 (1990) ("We conclude that even though inadvertence is a characteristic of most legitimate 'plain-view' seizures, it is not a necessary condition."); *see also Delva*, 858 F.3d at 149 (same). So it makes no difference to application of the plain view exception whether the law enforcement agents anticipated finding narcotics paraphernalia at 34 Houston Street.

Nor does it make any difference that it was not unlawful for Salaman to possess narcotics paraphernalia. The plain view exception extends not only to objects that are themselves contraband or unlawful to possess but also to other lawfully possessed objects for which there is probable cause to believe have been used to facilitate or are evidence of the commission of a crime. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 79-80 (2d Cir. 2018) (applying plain view exception to allow law enforcement agents to seize two cell phones during the course of protective sweep of a bedroom where "the officers had probable cause to seize the cell phones as likely connected with [defendant's] criminal activity"); *United States v. Joyner*, 2019 WL 1760843, at *4 (D. Conn. 2019) (plain view exception allowed seizure of hotel key card that defendant dropped where the police had probable cause to believe that the key was for a hotel room where narcotics were stored), *aff'd on other grounds*, 2022 WL 68204 (2d Cir. 2022).

Salaman misplaces his reliance on *Arizona v. Hicks*, *supra*, a case in which the Supreme Court declined to apply the plain view exception to the warrantless seizure of a stereo turntable when the police entered an apartment in response to a call about a shooting. The police noticed the turntable while inside the apartment and, suspecting that it had been stolen, they moved the turntable in order to view and record the serial number, which they in turn investigated and learned belonged to a stereo that had indeed been stolen.

The Supreme Court ruled that the plain view exception did not apply because the criminality of the turntable was not immediately apparent. The criminality was not apparent until the police moved the turntable to identify the serial number and then learned by further inquiry that it had been stolen. Because the police were inside the apartment in response to an emergency call to investigate a shooting, they had no right to move the belongings of the apartment occupants in search of contraband. That is, they had no lawful right of access to physically manipulate the turntable in order to view and record its serial number.

Here, by contrast, law enforcement agents were present at 34 Houston Street with the authority of a search warrant to move and search through the contents of the apartment to locate any items that were within the scope of the search warrant (*e.g.*, Salaman's Alcatel cellphone). Salaman makes no showing that the agents exceeded this authority or had no lawful right of access to examine the narcotics paraphernalia.[41] Accordingly, *Arizona v. Hicks* is readily distinguishable from this case.

---

[41] To be sure, the agents engaged in some physical manipulation by conducting field testing on the bags of cutting agent powder that disclosed more about their chemical character. But regardless of the results of any field testing, the agents in light of their substantial training and experience had probable cause just from a pre-testing visual inspection of the powder to conclude that it was incriminating, whether it was because the powder would contain a narcotic substance or whether the powder would *not* contain a narcotic substance and would function instead as a cutting agent.

In short, the plain view exception allowed the seizure of the narcotics paraphernalia evidence. Accordingly, I will deny Salaman's motion to suppress the seizure of narcotics paraphernalia evidence from 34 Houston Street.

CONCLUSION

For the reasons stated above, the Court DENIES the defendant Luis Salaman's motions to suppress (Docs. #78, #270).

It is so ordered.

Dated at New Haven this 29th day of July 2024 .

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge